**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Linda Sue EVANS, Defendant-Appellant.**

No. 87–3427.

United States Court of Appeals, Fifth Circuit.

June 23, 1988.

Modified on Rehearing Aug. 18, 1988.

**1354**

Ronald J. Rakosky, New Orleans, La. (court-appointed), Diane Polan, New Haven, Conn., for Evans.

Curtis Collier, Renee Clark McGinty, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, La., for U.S.

Before BROWN, GEE, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Linda Sue Evans (Evans) appeals her convictions for eleven offenses under the Gun Control Act of 1968, 18 U.S.C. §§ 921–928. We affirm.

### Facts and Proceedings Below

During February 1983, Evans purchased four firearms and three boxes of ammunition from three separate businesses in three separate transactions. In each of these transactions, Evans falsely represented herself to be Louise Robinett, exhibited a Louisiana driver's license with the name of Louise Robinett on it, and falsely answered certain questions on ATF Form 4473, which federally licensed dealers must complete pursuant to the sale of any firearm. *See* 27 C.F.R. §§ 178.124(a), 178.-124(c).

The transactions in question are as follows. On February 10, 1983, Evans purchased an UZI rifle bearing serial number SA31931 and one box of nine millimeter ammunition from Gretna Gun Works in Gretna, Louisiana. On this occasion, Evans falsely represented herself to be Louise Robinett and exhibited a Louisiana driver's license in that name. She also completed and signed ATF Form 4473, again using the name of Louise Robinett. On that form there is a question asking whether the purchaser has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. Evans answered no to this question. In fact, on January 28, 1971, Evans had pleaded guilty in an Illinois court to the crime of aggravated battery of a police officer, an offense punishable under Illinois law by imprisonment for a term exceeding one year. Also on February 10, 1983, Evans purchased an UZI rifle bearing serial number SA34982 from St. Bernard Indoor Shooting Center in Arabi, Louisiana. During this transaction, Evans again falsely represented herself to be Louise Robinett and exhibited the Louisiana driver's license containing that name. On the ATF Form 4473 she again signed her name as Louise Robinett and answered no to the form's question whether she had ever been convicted in any court of a crime punishable by a term exceeding one year. On February 11, 1983, Evans purchased a Ruger rifle and a Browning Hi-Power semiautomatic nine millimeter pistol from Sportsman's Guns and Accessories Shop in Norco, Louisiana. At that time, she also purchased two boxes of .223 caliber ammunition. During this transaction, Evans again represented herself to be Louise Robinett and exhibited the driver's license containing that name. As before, she also falsely answered the form's question regarding prior convictions and signed the form in the name of Louise Robinette.

On May 11, 1985, Evans was arrested for harboring a federal fugitive, Marilyn Jean Buck, who was wanted in connection with the widely publicized Brinks robbery that occurred in New York in 1981. At the time of her arrest, Evans was wearing a wig and glasses, and had on her person a Browning Hi-Power semiautomatic nine millimeter pistol of the same model as the Browning pistol that was purchased at Sportsman's Guns and Accessories Shop

(although it was not the same weapon). When arrested she also had in her possession certain false identification documents bearing what appears to be her photograph in the name of Rebecca Ann Morgan and certain other false identification documents in the name of Christine Johnson.

After Evans' arrest, government agents conducted a search of an apartment at 5714 The Alameda, Baltimore, Maryland. This search occurred in three stages. The initial search was made without a warrant, but was found to be reasonable due to exigent circumstances. *See United States v. Evans*, 629 F.Supp. 1544, 1551 (D.Conn.1986). During that initial search, government agents arrested Laura J. Whitehorn and briefly inspected the premises for other persons. After leaving the apartment, these same agents returned for a second time, again without a warrant, to search for bombs and other similar devices. During this second search, the agents seized various weapons, explosive devices, and ammunition. Among the items seized was the UZI rifle bearing serial number SA34982 (the St. Bernard UZI purchased February 10, 1983, as noted above). This search, and thus the seizure of these items, was subsequently determined to have been illegal. *See id.* at 1553–54. During the time the above two searches were taking place, other agents were already in the process of obtaining a warrant to search the apartment. The warrant was obtained, and pursuant to it a third and lawful search took place. *See id.* at 1554. During this third search, the police discovered numerous items that were subsequently introduced into evidence in the instant trial. Among these were certain identification documents in the names of Linda Sue Evans, Christine Johnson, Rebecca Ann Morgan, and Louise Robinett, among others. Many of these documents contained what appeared to be Evans' photograph. Also found were a warranty card and a manual for an UZI rifle, both of which contained the serial number for the St. Bernard UZI, and a handwritten list of where various weapons, including three of the four weapons involved in the present case, had been purchased.

In an eleven-count indictment returned September 6, 1985, Evans was charged with eleven violations of the Gun Control Act of 1968, 18 U.S.C. §§ 921–928. In Counts One, Two, and Three, Evans was charged with three violations of what is now codified as 18 U.S.C. § 922(g)(1),[1] stemming from the three transactions on February 10 and 11, 1983 in which she purchased firearms. In Counts Four, Five, and Six, Evans was charged with three violations of 18 U.S.C. § 922(a)(6),[2] again based on the three separate purchases of firearms on February 10 and 11. In Counts Seven and Eight, Evans was charged with two violations of section 922(a)(6) based on the two separate purchases of ammunition on those two days.

---

1. At the time that the indictment was filed, and at the time the offenses in question were committed, this provision was codified as 18 U.S.C. § 922(h)(1) and provided in pertinent part:

"(h) It shall be unlawful for any person—
"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
" . . . .
"to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

In 1986, section 922(h) was recodified as section 922(g), clause (1) was amended to eliminate the phrase "is under indictment for, or who," and there was added at the beginning of the last clause of what became section 922(g) the following: "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or." None of these changes are material here.

2. Section 922(a) provides (and provided at all relevant times) in pertinent part:

"(a) It shall be unlawful—
" . . . .
"(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter."

And in Counts Nine, Ten, and Eleven, Evans was charged with three violations of 18 U.S.C. § 924(a),[3] again based on the three firearms transactions of February 10 and 11.

On October 18, 1985, Evans entered pleas of not guilty to all eleven counts in the indictment. Prior to trial, numerous motions were filed on behalf of both parties. In one such motion, Evans moved to suppress the St. Bernard UZI itself, which was the subject of the charges in Counts Two, Five, and Ten. The district court granted this motion to suppress on the ground of collateral estoppel. *See United States v. Evans,* 655 F.Supp. 243, 246 (E.D.La.1987). Evans also moved to suppress all of the documentary and testimonial evidence that was related to the purchase of the St. Bernard UZI on the ground that such evidence was obtained by tracing the serial number that was found on that weapon. The district court denied Evans' motion to suppress this other evidence, holding that, by reason of the independent source and inevitable discovery exceptions to the exclusionary rule, the evidence was not subject to suppression.

From March 16 to March 20, 1987, this case was tried before a jury. During *voir dire,* Evans requested an additional peremptory challenge because two alternate jurors were selected. The district court denied this request. At trial, the government was permitted to introduce into evidence, over Evans' objection, various items including principally the Browning pistol in Evans' possession at the time of her arrest; the wig and the glasses that Evans was wearing at her arrest; numerous false identification documents, some of which were found on Evans' person when she was arrested and others of which were found in the Baltimore apartment; and certain wigs that were found in the Baltimore apartment. The defense presented no evidence. On March 20, 1987, the jury returned a verdict of guilty on all eleven counts. The district court sentenced Evans to consecutive five-year terms of imprisonment on Counts One through Eight, and to five-year sentences on each of Counts Nine through Eleven with each such sentence to be concurrent with the sentences under Counts One through Eight, for a total confinement of forty years. This appeal followed.

### Discussion

Evans raises several different complaints on her appeal, but does not challenge the sufficiency of the evidence on any count. Her first contention is that the district court erroneously denied her the additional peremptory challenge to which she was entitled because two alternate jurors were chosen. At first glance, Evans appears to have a compelling argument for reversal. After all, Fed.R.Crim.P. 24(c) clearly provides that when two alternate jurors are impaneled, both the defense and the prosecution are entitled to an additional peremptory challenge.[4] Furthermore, a

---

3. Section 924(a) provided, at the time of these offenses and when the indictment was returned, as follows:

"(a) Whoever violates any provision of this chapter or knowingly makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine."

Subsequent amendments of section 924(a) are not relevant here.

4. Rule 24(c) provides:

"(c) Alternate Jurors. The court may direct that not more than 6 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 alternate jurors are to be impanelled, 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled, and 3 peremptory

number of cases have held that reducing the number of peremptory challenges to which a defendant is entitled or otherwise abridging a defendant's right to exercise his peremptory challenges results in an impairment of a substantial right and thus requires reversal. *See, e.g., United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977); *United States v. Scott,* 555 F.2d 522, 533 (5th Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977); *United States v. Sams,* 470 F.2d 751, 755 (5th Cir.1972); *United States v. Boyd,* 446 F.2d 1267, 1275 n. 27 (5th Cir.1971). Although the district court's failure to allow Evans an additional peremptory challenge was surely error, unlike the situations in the cases to which Evans refers us, this error could not have caused Evans any prejudice because the alternate jurors were excused prior to commencement of the jury's deliberations. Because neither of the alternate jurors served on the jury, the fact that Evans was denied a right to use a peremptory challenge against one of them could have had no effect on the trial. Therefore, this denial was not prejudicial.

Evans attempts to circumvent this seemingly obvious point by suggesting that since she might have used her additional strike against one of the regular jurors, it is impossible to establish that she was not prejudiced by this violation of Rule 24(c). This argument is plainly wrong. Rule 24(c) expressly provides that "any additional peremptory challenges" that are allowed because alternate jurors are impaneled "may be used against an alternate juror only" and that the regular peremptory challenges "may not be used against an alternate juror." Hence, even if Evans had been granted the additional peremptory challenge, Rule 24(c) would have prevented her from using this challenge against one of the regular jurors (and Evans did not, and was not entitled to, use any of her regular peremptories against any alternate). Given that the composition of the jury would have remained the same whether or not the district court had allowed Evans an addi-

tional peremptory challenge, we believe that in fact it *is* possible to establish that no prejudice arose from this error. We therefore hold that the district court's denial of an additional peremptory challenge did not affect Evans' substantial rights and thus was harmless error. *See* Fed.R. Crim.P. 52(a).

■ Evans' second contention is that the documentary and testimonial evidence that was relevant to the counts involving the St. Bernard UZI was erroneously admitted into evidence. Specifically, Evans charges that (1) because the government obtained the ATF Form 4473, the sales invoice, and the cash register receipt that were used in the purchase of the St. Bernard UZI, as well as the testimony of an employee of the St. Bernard Indoor Shooting Center, by tracing the serial number that was found on this UZI, and (2) because this UZI was later determined to have been illegally seized, *see Evans,* 629 F.Supp. at 1553–54, the above evidence should also have been suppressed under the "fruit of the poisonous tree" doctrine. *See Nardone v. United States,* 308 U.S.338, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). The government responds to this charge by arguing that without the UZI itself the government could and would have discovered this evidence just as easily by using the serial number contained in the UZI warranty card and the UZI manual, both of which were lawfully seized from the Baltimore apartment. Thus, the government argues, this evidence falls within the inevitable discovery exception to the exclusionary rule that was recognized in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

Evans challenges the government's attempt to bring this evidence within the inevitable discovery exception by arguing that the government failed to meet the requisites that this Court established in *United States v. Cherry,* 759 F.2d 1196 (5th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). In *Cherry,* this Court stated that

challenges if 5 or 6 alternate jurors are to be impanelled. The additional peremptory challenges may be used against an alternate juror

only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror."

"[i]n order for the exception to apply, the prosecution must demonstrate both a reasonable probability that the evidence would have been discovered in the absence of police misconduct and that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." 759 F.2d at 1205–06.

On the facts of this case, we sustain the district court's determination that both *Cherry* requirements were adequately met.

With respect to the first requirement, the evidence shows that the government was intensely interested in prosecuting anyone involved with the infamous Brinks robbery and was actively pursuing available leads in its investigation. Even if the government had never discovered the St. Bernard UZI at the Baltimore apartment, it is evident that the government would have traced the Louisiana documents related to the St. Bernard UZI by using the serial number on the warranty card or the manual found in the apartment. With respect to the second requirement, it is undisputed that at the time that some agents were undertaking an illegal search of the Baltimore apartment and were illegally seizing the St. Bernard UZI and other items, other agents were already in the process of obtaining a warrant from a magistrate to search the apartment. This alternative line of investigation led the agents to discover the warranty card and the manual. These items could just as easily (and, in light of the nature and purpose of the ongoing investigation, doubtless would) have been used to find the Louisiana documents and the related testimony independently of the illegally seized rifle itself. The *only* relevance of the UZI itself was the serial number on it, which was equally disclosed on the rifle's warranty card and manual. On these facts, the district court was justified in finding that both *Cherry* requirements were adequately satisfied. We therefore hold that the district court did not err in admitting into evidence the documents and the testimony that were relevant to the counts involving the St. Bernard UZI.

We believe that the district court's ruling concerning these items of evidence is supportable on a related ground as well. In *Cherry*, we also stated that

"[i]n certain circumstances ... such as when the hypothetical independent source comes into being only after the misconduct, the absence of a strong deterrent interest may warrant the application of the inevitable discovery exception without a showing of active pursuit by the government in order to ensure that the government is not unjustifiably disadvantaged by the police misconduct." 759 F.2d at 1206.

In the present case, if the warranty card and manual are viewed as an independent source that came into existence only after the illegal search that produced the St. Bernard UZI took place, then even if the procuring of a warrant to search the apartment did not constitute active pursuit of a substantial alternate line of investigation, the documents and testimony relating to this UZI would nonetheless not have to be excluded if no strong deterrent interest would be served thereby. Here, we perceive no such interest. In our view, the deterrent purpose of the exclusionary rule—the prevention of police conduct that violates a person's Fourth Amendment guarantees—was adequately served by suppression of the UZI itself. Such suppression prevented the prosecution both from introducing the direct fruits of its illegality and from being put in a better position than it realistically would have been without a constitutional violation. *See Nix*, 104 S.Ct. at 2511; *Cherry*, 759 F.2d at 1203. However, if in addition to the St. Bernard UZI, this other evidence had been suppressed, then the prosecution would, in a practical sense, have been put in a much worse position, for evidence that just as easily could have been and doubtless would have been discovered from an independent, albeit subsequent, source, would not have been available to it. As we stated in *Cherry*,

"the 'core rationale' of the [exclusionary] rule is to deter police misconduct by ensuring that the prosecution is not put in a better position than it would have been in if no illegality had transpired. The

high social cost of allowing obviously guilty persons to go unpunished, however, requires at the same time that the prosecution generally not be put in a *worse* position by the operation of the rule than it would have been in but for the constitutional violation." 759 F.2d at 1203.

For this reason also, then, we hold that the challenged evidence was properly admitted under the inevitable discovery/independent source exception to the exclusionary rule.

■ Evans' next contention is that certain items seized at the Baltimore apartment were improperly admitted into evidence because they were not authenticated. Evans asserts that the testimony of government agent Kenneth R. Dougal (Dougal) was insufficient to establish a connection between the apartment and Evans. On direct examination of Dougal, the following exchange took place:

"Q [by Mrs. McGinty for the government]. Did there come a time on May 11, 1985, when you searched an apartment located at The Alameda (ph.) in Baltimore, Maryland?

"A. That's correct.

"Q. To your knowledge, was the defendant one of the occupants of that apartment?

"MR. RAKOSKY [for Evans]: I object on grounds of hearsay, Your Honor.

"THE COURT: Overruled.

"MR. RAKOSKY: Note my objection.

"THE COURT: Mr. Rakosky, this is not criminal court in Orleans Parish. Your objection is not necessary to be noted. It's already on the record.

"THE WITNESS: To my knowledge, she was not there.

"BY MRS. McGINTY:

"Q. Was she an occupant, at one point, of that apartment?

"A. Yes, sir—correction, yes, ma'am."

Although this exchange shows that Evans objected to the second above-quoted question to Dougal, the answer to that question was, if anything, favorable to Evans. What connected Evans to the apartment was the answer to the next question, as to which there was never any objection nor

any subsequent motion to strike or the like. Because Evans failed to object to or otherwise then or later seek any relief respecting this last-quoted question or its answer, she has not preserved this putative error for review. *See United States v. Miller*, 600 F.2d 498, 500 (5th Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979); *United States v. One (1) 1963, Hatteras Yacht Ann Marie*, 584 F.2d 72, 75 (5th Cir.1978); Fed.R.Evid. 103(a)(1). *See generally* 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5034 (1977 & Supp. 1987). Although this Court has the power to notice *sua sponte* plain error in the proceedings below and to reverse on that basis, *see* Fed.R.Crim.P. 52(b), we do not believe that an unchallenged hearsay statement such as the one here linking Evans to the apartment rises to the level of error that is "so obvious that failure to notice it would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir.1971) (quoting *United States v. Atkinson*, 297 U.S. 157, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). This is particularly so in light of the fact that Evans was also connected to the apartment by the presence there (in the same closet) of identification documents in her name, some bearing what the jury could conclude was her picture, and identification documents, also bearing pictures the jury could conclude were of Evans, in the names of other people, including the same names found on the false identification papers Evans had when arrested and the name of Louise Robinett (including the same false Louise Robinett driver's license that was used in purchasing the weapons and ammunition at issue here). Also found in the apartment were the warranty card and manual for the St. Bernard UZI Evans had purchased using this same false Robinett driver's license. The district court did not abuse its discretion in determining that a sufficient showing of Evans' connection to the apartment was made to justify the admission in evidence of the challenged items found there; what weight, if any, to

give the challenged evidence was properly left to the jury.

Evans also objects to the admission in evidence of certain items pursuant to Fed. R.Evid. 404(b).[5] These items include: the Browning pistol, the ammunition, and the gun case that were found on Evans' person at the time of her arrest; the wig and the glasses that Evans was wearing when arrested; certain wigs that were seized from the Baltimore apartment; and various false identification documents that were found on Evans' person when arrested and in the Baltimore apartment. The test for determining whether extrinsic offense evidence is admissible under Rule 404(b) is well-established in this Circuit. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc) (footnote omitted), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

■ Evans argues essentially that this evidence was not at all relevant to the only contested issue in the case—identity. We disagree. Evans' argument seems to be that because these items do not constitute a "signature" or otherwise demonstrate a particular, identical "modus operandi," they are not relevant to the issue of who committed the crimes charged. In our view, this argument depends upon an unduly narrow conception of identity evidence. As Wright and Graham have pointed out:

"The exception in Rule 404(b) for use of other crimes evidence to prove identity will probably be used most often ... '[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.' This exception, often referred to as the

'handiwork or signature exception' or the exception for 'modus operandi' is, however, only one method by which other crimes can prove identity. It is important that courts recognize these different modes so as not to impose requirements, such as distinctive similarity, that apply only to the modus operandi method of identification, on different methods of using other crimes evidence to show identity." 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5246, at 512 (1978).

In prior cases, we have heeded Wright and Graham's warning and implicitly rejected the narrow view of identity evidence urged by Evans here. *See, e.g., United States v. Aguirre Aguirre*, 716 F.2d 293, 300 (5th Cir.1983); *United States v. Montemayor*, 684 F.2d 1118, 1121 (5th Cir.1982). We explicitly reject such a narrow view in this case.

In our view, all of the evidence challenged as improperly admitted under Rule 404(b) is relevant to the issue of identity. Although the Browning pistol found on Evans' person at the time of her arrest was not the very same Browning pistol that was purchased in Louisiana, it was the identical make and model, and the fact that she had such a pistol suggests that she knew about this very type of pistol and perhaps preferred it to other types, thus increasing the probability that it was Evans who purchased the Browning pistol that was purchased in Louisiana. Likewise, the fact that Evans was wearing glasses and a wig at the time of arrest and that there were wigs among the effects in the Baltimore apartment connected to Evans tends to make it more probable than if she had not possessed such items that Evans in fact did alter or disguise her appearance so as to obtain the driver's license in Louise Robinett's name used in purchasing the guns and ammunition in question, which license bears a picture that the jury could conclude

---

5. Rule 404(b), Fed.R.Evid., states:

"**(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity there-

with. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

was that of Evans wearing a wig and glasses similar to those she wore at her arrest. The same is true for the false identification documents: the fact Evans had in her possession when arrested, and that there were in the Baltimore apartment, a variety of false identification documents, including the false Louise Robinett license found in the apartment with Evans' identification and other false documents bearing photographs which the jury could conclude were of Evans, makes it more likely that it was she who used the false Louise Robinett license in purchasing the guns and ammunition in question. Given that all of the above items of evidence are relevant to the issue of who in fact purchased the weapons and ammunition charged in this case, and that this issue was the *only* issue in the case, we hold that the district court did not abuse its discretion in admitting these items into evidence pursuant to Rule 404(b).

■ Evans' next argument is that Counts Seven and Eight, which pertain to the purchase of ammunition on two different occasions, are multiplicitous with Counts Four and Six, respectively, which relate to the purchase of firearms on those same two occasions. Citing *United States v. Long*, 524 F.2d 660 (9th Cir.1975), and *United States v. Mastrangelo*, 733 F.2d 793 (11th Cir.1984), Evans argues that the unit of prosecution prescribed by Congress in section 922(a)(6), which is the statute that was allegedly violated in all four counts, is the giving of false information. *See Mastrangelo*, 733 F.2d at 800; *Long*, 524 F.2d at 662. From this Evans concludes that even though she bought guns and ammunition simultaneously in two separate transactions, because there was only one act of deceit connected with each transaction, she can only be charged with one violation of section 922(a)(6) in relation to each transaction. We disagree.

It is beyond doubt that "Congress can impose multiple criminal sanctions for a single act." *United States v. Stovall*, 825 F.2d 817, 821 (5th Cir.), *modified in other respects*, 833 F.2d 526 (1987). We believe that Congress has done so here for essen-

tially two reasons. First, the statute itself expressly identifies two classes of items that cannot be acquired in the prohibited manner and, by its use of the disjunctive, makes plain that what is proscribed is the making of false statements with respect to facts material to the lawfulness of the sale of *either* class of items and *not*, as Evans would have it, one class or the other *or both*. Cf. *Normandale v. United States*, 201 F.2d 463, 464 (5th Cir.), *cert. denied*, 345 U.S. 999, 73 S.Ct. 1141, 97 L.Ed. 1405 (1953) (holding that purchaser of heroin hydrochloride and raw opium in a single transaction could be charged with and punished for two separate offenses under statute that made it unlawful to "purchase, sell, dispense, or distribute opium, isonipecaine, coca leaves, opiate, or any compound, salt, derivative, or preparation thereof, except in or from the original stamped package").

Second, under the rule established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the two offenses charged in respect of each transaction are sufficiently distinguishable that cumulative punishment may be imposed. In discussing the *Blockburger* rule, the Supreme Court has stated:

"In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), this Court set out the test for determining 'whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment.' *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). We held that '[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Blockburger v. United States, supra*, [284 U.S.] at 304, 52 S.Ct. at 182. See also *Brown v. Ohio, supra*, [432 U.S.] at 166, 97 S.Ct. at 2225; *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958)." *Simpson*

*v. United States*, 435 U.S. 6, 98 S.Ct. 909, 912, 55 L.Ed.2d 70 (1978).

Here, each firearm offense required proof of a fact that each ammunition offense did not, and vice versa. For example, both Counts Four and Six required the government to establish beyond a reasonable doubt that Evans had knowingly made a false statement or exhibited some false identification intending to deceive a licensed dealer with respect to a fact material to the lawfulness of the sale in connection with the sale of "any *firearm.*" By contrast, Counts Seven and Eight required the government to prove beyond a reasonable doubt that Evans had made a false statement or exhibited some false identification intending to deceive a licensed dealer with respect to a fact material to the lawfulness of the sale of "*ammunition.*" Without question, there is a substantial overlap in the proof required for Counts Four and Seven on the one hand, and Counts Six and Eight on the other. However, as this Court has observed in discussing two allegedly multiplicitous offenses, "[i]f both offenses require proof of a fact not necessarily required by the other then *Blockburger* is satisfied and sentences under each statutory provision may be constitutionally imposed even though there is a substantial overlap in the proof offered to establish the crimes." *Stovall*, 825 F.2d at 822; *see Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975). For these reasons, then, we hold that neither Counts Four and Seven nor Counts Six and Eight constituted one offense for the purpose of imposing punishment and, therefore, that the district court did not err in imposing cumulative sentences in connection with Counts Four and Seven on the one hand and Counts Six and Eight on the other.

Evans' final argument is that Counts Nine, Ten, and Eleven, the sentences on which were concurrent with the sentences on the other counts, are multiplicitous with Counts Four, Five, and Six, respectively, and that therefore the convictions pursuant to Counts Nine, Ten, and Eleven should be vacated. Counts Nine, Ten, and Eleven charge violations of section 924(a) (*see* note 3, *supra*); Counts Four, Five, and Six charge violations of section 922(a)(6) (*see* note 2, *supra*). The parties do not dispute that these six counts arise from conduct on three distinct occasions: Counts Four and Nine from the purchase of an UZI rifle at Gretna Gun Works; Counts Five and Ten from the purchase of another UZI at St. Bernard's Indoor Shooting Center; and Counts Six and Eleven from the purchase of the Ruger rifle and Browning pistol at Sportsman's Guns and Accessories Shop. They simply reach different conclusions as to the propriety of obtaining two convictions and imposing two, albeit concurrent, sentences in connection with each of the three transactions.

Evans argues that this case is like *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), in which the Supreme Court held that a defendant charged with violating both 18 U.S.C. § 922(h)(1) (unlawful receipt of a firearm) and 18 U.S.C. § 1202(a) (unlawful possession of a firearm) in a single transaction could be charged with but could *not* be convicted of (or punished for) violating both of these statutes because in a single act situation "proof of illegal receipt of a firearm *necesarily* includes proof of illegal possession of that weapon." *Ball*, 105 S.Ct. at 1672. In Evans' view, proof that a defendant knowingly makes a false statement intended or likely to deceive a licensed dealer with respect to a fact material to the lawfulness of the sale of a firearm necessarily includes proof that the same defendant knowingly made a false statement to a licensed dealer with respect to information required by law to be kept in the dealer's records. Therefore, she reasons, under the *Ball* rationale she cannot be convicted of and punished for violating both section 922(a)(6) and section 924(a). The government disagrees with Evans' analysis of the relationship between sections 922(a)(6) and 924(a). It argues, citing *United States v. Anaya*, 615 F.Supp. 823 (N.D.Ill.1985), that the two statutes create separate offenses because they require different elements of proof. Section 922(a)(6) proscribes knowing false statements in-

tended or likely to deceive a licensed dealer with respect to a fact material to the lawfulness of the sale; however, section 924(a) does away with section 922(a)(6)'s requirements that the false statement be intended or likely to deceive and that it concern a fact material to the lawfulness of the sale, thus reaching a potentially broader range of conduct.

■ Although we are of the opinion that the government's argument is incomplete, we agree with the government that sections 922(a)(6) and 924(a) create separate offenses. More specifically, we determine that the two statutes are sufficiently separate to permit Evans to be convicted of offenses under both statutes in connection with each of the three weapons transactions charged in the indictment. These two offenses satisfy the *Blockburger* test described above. As the Court in *United States v. Hawkins,* 794 F.2d 589 (11th Cir. 1986), noted: "18 U.S.C. § 922(a)(6) requires that the government prove that the defendant made a false statement material to the lawfulness of the sale of firearms.... Section 924(a) does not require the government to prove this element." 794 F.2d at 590–91. Conversely,

"18 U.S.C. § 924(a) requires that the government prove that the defendant made a false statement related to information required by law to be kept in the records of a federally-licensed firearms dealer. Since this information need not necessarily be material to the lawfulness of the sale, § 922(a)(6) does not require proof of this element." *Hawkins,* 794 F.2d at 591.

Although we perceive a considerable overlap in the conduct proscribed by these two statutes, under *Blockburger* that is imma-

terial. As long as each statute requires proof of an additional element that the other does not, as is clearly the case here, then the test is satisfied and cumulative punishment may be imposed on conduct that in factual terms represents a single act. There may be facts material to the lawfulness of the sale—such as the purchaser's conviction of an offense punishable by less than one year which renders the sale illegal under the law of the state where it takes place, *see* 18 U.S.C. § 922(b)(2)—which are not required to be kept in the dealer's records. Similarly, facts required to be kept in the dealer's records, such as the purchaser's height, weight, race, date of birth, and street address of residence, may not, in a given case, be material to the lawfulness of the sale. Further, section 922(a)(6) requires an intent to deceive, or likely deception of, the dealer, while section 924(a) does not.

Finally, the weight of authority supports the view that sections 922(a)(6) and 924(a) create separate offenses that permit the imposition of cumulative punishment. *See Hawkins,* 794 F.2d at 590–91; *United States v. Buck,* 548 F.2d 871, 876–77 (9th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977); *cf. Anaya,* 615 F.Supp. at 827 (holding that defendant may be charged with violations of sections 922(a)(6) and 924(a) in indictment even though both offenses related to same conduct, but reserving issue as to whether cumulative punishment is authorized). Because we believe that the view that these two statutes constitute two offenses under *Blockburger* is consistent with the applicable Supreme Court precedents in this area, we are reluctant to create a circuit conflict on this issue in the absence of authority for a contrary view.[6] We therefore hold that

---

6. In *Davis v. Herring,* 800 F.2d 513 (5th Cir. 1986), we observed that *"Whalen v. United States* [, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980),] and *Harris* [*v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977),] make clear that, when violation of a complex statute is charged, the *Blockburger* test may be modified to require that the court examine only the relevant portions of the statute and the actual underlying felony." *Davis,* 800 F.2d at 519 (footnote omitted). From this an argument might be made that in a case such as the present

the offense charged pursuant to section 922(a)(6) and the offense charged pursuant to section 924(a) are in reality one offense. Such an argument would maintain that sections 922(a)(6) and 924(a) are complex statutes, each of which proscribes, in the disjunctive, a discrete number of acts, many of which are overlapping. From this, the argument would conclude that on the facts of this case the act proscribed by both sections was the same and, therefore, there was only one offense under the *Blockburger* rule. Although this argument

the district court did not err in determining that Counts Nine, Ten, and Eleven were not multiplicitous with respect to Counts Four, Five, and Six, respectively, and as a consequence, that Evans could properly be convicted under all six counts.

### Conclusion

We conclude that none of Evans' complaints on appeal presents any reversible error. We therefore affirm the district court's judgment in all respects.

AFFIRMED.

would, to our thinking, have a certain plausibility, a more realistic view of the applicable precedents indicates that such an analysis would be impermissibly fact-based. In *Whalen,* for example, the statute itself was written in the disjunctive, *see* 100 S.Ct. at 1434–35; in other words, there was no need for the court to break down the statutory categories any further. We are not inclined to make such a substantial extension of the relatively narrow *Whalen* exception. As we noted in *Davis,* "[t]he [Supreme] Court has ... specified that the *Blockburger* test is to be applied to the elements of proof required by the statute and not to the actual evidence or proof adduced at trial in a given case." *Davis,* 800 F.2d at 517; *see also id.* at 517 n. 17 (citing cases). On the basis of the relevant precedents, we see little support for the view that these two offenses in fact constitute one offense under *Blockburger.*