**Allen L. FLUDD, Plaintiff,**

v.

**U.S. SECRET SERVICE, et al., Defendants.**

Civ. A. No. 82–2172.

United States District Court, District of Columbia.

Oct. 22, 1986.

Clausen Ely, Jr., David F. Williams, Covington & Burling, Washington, D.C. (Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union Fund of the National Capital Area, Washington, D.C., of counsel), Joan Harvill, Washington, D.C., for plaintiff.

Rebecca L. Ross, Asst. U.S. Atty., Washington, D.C., for defendants; John Meenan,

Donna Boudreau, Office of Legal Counsel, U.S. Secret Service, of counsel.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiff Allen L. Fludd has brought this action against the United States Secret Service and six of its past or present employees, alleging that four Secret Service agents violated his Fourth Amendment rights when they served a handwriting subpoena on him in August 1979, and that two of the agents' superiors also violated his rights because, among other things, they improperly supervised the agents. Plaintiff seeks damages from the six employees in their individual capacities and a declaratory judgment against the Secret Service. Defendants have moved for summary judgment on all of these claims.[1] The motion will be granted.

I

In 1979, the special agent defendants were investigating a check forgery case involving one Zeno Kittrell. Kittrell had claimed that his D.C. tax refund check was stolen, and he filed a claim for $964.25. According to Kittrell, the check had been sent to 609 Nicholson Street, N.W., Washington, D.C., the home address of his wife, Martha Kittrell, and his stepson, plaintiff Allen Fludd. Although Kittrell was co-owner of the Nicholson Street home, he had moved out in January of 1979—some eight months before the events in controversy. Kittrell had taken virtually all of his belongings with him, and he had made only brief visits to Nicholson Street through April, in order to pick up his mail. In fact, in February of 1979, Mrs. Kittrell had changed the locks on all the doors to the Nicholson Street house, and Kittrell was never given a key to these new locks.

On July 16, 1979, one of the agents interviewed plaintiff about the missing check. However, Fludd stated that he knew nothing about the check, and he declined to provide a handwriting sample. The next day, a handwriting subpoena was issued.

Three weeks later, on August 3, 1979, two of the agents went to 609 Nicholson Street to serve the subpoena. They knocked on the front door but no one answered; plaintiff claims that he was upstairs listening to the radio. Meanwhile, the agent had the Secret Service dispatcher contact Kittrell in order to let the agents in. The dispatcher soon advised the agents that although Kittrell no longer lived at 609 Nicholson Street, he still had access to the house and would let them in.

Kittrell arrived about ten minutes later. He told the agents directly what they had learned from the dispatcher: that he no longer lived in the house, but that he owned it and still had access to it. He also stated that he could let the agents in through the back door. Thereafter, two of the agents covered the front door, while Kittrell permitted two other agents to enter the house through the basement which, he explained, was always unlocked.[2]

By this time, Fludd was downstairs, wearing only his undershorts. According to his version of the events, he was standing in the kitchen when he suddenly saw one of the agents enter from the basement stairs with a handgun. The agent pointed the gun in Fludd's face and warned him to freeze; he handed Fludd the subpoena;

1. On February 27, 1985, this Court deferred a ruling on this summary judgment motion, in order to hold a hearing on various factual matters. These matters included Zeno Kittrell's authority to grant entry to the Nicholson Street house; the agents' belief regarding Zeno Kittrell's authority, and the reasonableness of that belief; and the agents' reasons for serving the subpoena when and where they did. *Fludd v. United States Secret Service*, C.A. No. 82–2172 (D.D.C. Feb. 27, 1985) (Memorandum). On the government's appeal from that decision, the Court of Appeals directed this Court to resolve the summary judgment motion solely on the basis of papers already filed and additional affidavits. *Fludd v. United States Secret Service*, No. 85–5336 (D.C.Cir. Apr. 15, 1985) (Order).

2. Kittrell apparently did not tell the agents that his wife had changed the front and back door locks, and that he did not have a key to the rear door.

and he, as well as the other agents, left.[3] Fludd asserts that the agents entered "without the consent of any resident," in violation of his Fourth Amendment rights.

## II

It is agreed that the individual defendants are entitled to summary judgment if they had qualified immunity, and also that the qualified immunity issue is govered by *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As may be expected, however, the parties disagree in their interpretation of that decision.

The *Harlow* decision changed the law of qualified immunity. Before *Harlow,* courts were required to examine not only the official's knowledge of the constitutional rights in question, but also his subjective intent in acting against those rights. *Harlow* eliminated subjective element, and the law now is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

Since *Harlow* was decided, the Court of Appeals for this Circuit has stated that "if the trial judge determines that the law was not clearly established at the time the conduct occurred, the inquiry ceases and the official is entitled to summary judgment." *Hobson v. Wilson,* 737 F.2d 1, 25 (D.C.Cir. 1984); *see also Zweibon v. Mitchell,* 720 F.2d 162, 168 (D.C.Cir.1983). In line with these decisions, the Court's inquiry must be whether, in August of 1979, the law on consent to authorize a warrantless search was clear. At the time—as well as now— the controlling case on this subject was *United States v. Matlock,* 415 U.S. 164, 94

S.Ct. 988, 39 L.Ed.2d 242 (1974). The *Matlock* court held that a warrantless search is not illegal if permission therefor was obtained from a third party "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171, 94 S.Ct. at 993. In a footnote, the court explained that this "common authority" does not derive from a third party's mere property interest in the property, but rather depends on

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7.

Plaintiff argues that Kittrell could not effectively consent to entry of the Nicholson Street house since he did not have mutual use of the property or joint access or control for most purposes. In another posture, the Court might agree. However, the question here is whether the ineffectiveness of Kittrell's consent was well established on August 3, 1979. Several cases interpreting *Matlock* now persuade this Court that it was not.[4]

In *United States v. Long,* 524 F.2d 660 (9th Cir.1975), the defendant's wife contacted the FBI to inform them that she had left the home she shared with her husband because she feared for her safety. One month later, however, she went to the home with FBI agents and signed a consent form allowing them to search the house. Since her keys no longer fit the locks, the agents entered by removing a window in a storage building next to the

---

**3.** The Court notes that it is difficult to believe that the Secret Service really needed to enter the Nicholson Street house to serve a subpoena with guns drawn three weeks after that subpoena had been issued.

**4.** This Court still believes that a decision on this issue could be rendered with far more confi-

dence if additional facts concerning the prior relationship of Kittrell to the Nicholson Street house were available. However, the decision of the Court of Appeals (*see* note 1, *supra* ) has made that impossible. Accordingly, the Court proceeds on the basis of the information which is available.

house. The court rejected an argument that Mrs. Long, as joint owner, did not have the right to consent to entry of the house. *Id.* at 661.

In *United States v. Cook*, 530 F.2d 145 (7th Cir.1976), a property owner consented to an FBI search of a poultry shed, most of which was set aside for the exclusive use of defendant, who rented the shed. In finding apparent authority to consent to the search, the court said that the mere act of giving consent is an indication of authority to do so. *Id.* at 148. In *United States v. McMurtrey*, 534 F.2d 1321 (8th Cir.1976), the co-owner of a farm had moved out of the house after marital problems arose with his wife. Next to the house was a storage shed, which the co-owner had entered two or three times since moving out. The court upheld the co-owner's consent to search the shed.

On the other hand, in *United States v. Harris*, 534 F.2d 95 (7th Cir.1976), the court ruled that the mere assertion by a certain Edwardsen that he had permission to use Harris' apartment did not give arresting officers sufficient basis to believe that Edwardsen could validly consent to a search of that apartment. In that case, Edwardsen had known Harris only briefly and had been in the apartment alone only once. He did not have a key, but let the officers in through a sliding glass door at the side of the building.

The decisions discussed above indicate that the law on consent to search was still developing when the events in question occurred. While the cases in which these decisions were rendered are factually somewhat distinguishable from the facts here, this does not help plaintiff, for the issue is whether, at the time of the agents' entry, they were violating clearly established law.

■ In the view of the Court, the agents could reasonably believe that Kittrell had a "sufficient relationship" to the Nicholson Street premises. Kittrell was the co-owner

of the property. He advised the agents that he still had access to it, and proved this by permitting them to enter through a door—albeit a rear door. He did not inform the agents that his wife had changed the locks and that he did not have a key to that rear door. Given these facts, the Court cannot conclude that the agents violated the *Matlock* standard. Federal agents carrying out their assigned duties may not be held financially accountable every time their momentary evaluation of an imprecise legal standard does not match up with what a court, years later, may carefully decide. In short, the *Harlow* decision requires a finding that the agents who served the subpoena, as well as their supervisors, are immune from this lawsuit.[5]

### III

■ Plaintiff also seeks a declaratory judgment against the Secret Service that its agents violated his constitutional rights. However, plaintiff lacks standing in that regard since the injury he has suffered will not be redressed by the relief he seeks. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), where the Supreme Court rejected a request for an injunction by a man who claimed that a dangerous police "chokehold" violated his constitutional rights, ruling in part that the respondent had no standing to bring such a claim, because of "the speculative nature of his claim that he will again experience injury as a result of that practice even if continued." *Id.* at 109, 103 S.Ct. at 1669.

Plaintiff has failed to make any showing that a declaratory judgment will in any tangible way redress his injuries. He merely argues that he "could well be implicated in some future situation involving his Fourth Amendment rights that could be violated if the Secret Service is not required to reckon with its procedures ...,"[6] and he further warns that "the only way"

---

5. Plaintiff concedes that all six individual defendants stand on the same footing. Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 26.

6. Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 35.

to ensure that the Secret Service will prevent further "violations" of this kind is to grant the declaratory judgment. *Id.*

These vague predictions do not satisfy the requirement of tangible relief under *Lyons* and similar decisions. It is difficult to believe that plaintiff will again be involved with the Secret Service under circumstances so close to these that a declaratory judgment would prevent the Service from acting.

For these reasons, defendants' motion for summary judgment will be granted.